People of State of Illinois ex rel. Virginia A. Kenny, Appellee, v. John R. Fornof et al., Appellants.

Gen. No. 45,007.

Opinion filed March 13, 1951. Rehearing denied April 4, 1951. Released for publication April 6, 1951.

WILLIAM E. BRITTON, of Urbana, and SNYDER, CHADWELL & FAGERBURG, of Chicago, for appellants; RICHARD M. KECK, MARSHAL WIEDEL, and WILLIAM L. NIEMAN, all of Chicago, of counsel.

RICHARD F. MCPARTLIN, Jr., of Chicago, for appellee.

MR. JUSTICE FRIEND delivered the opinion of the court.

Virginia A. Kenny, a civil service employee of the University of Illinois, sought by mandamus to compel the defendants, the Board of Trustees of the University of Illinois, to restore her to the position of Head of the Social Service Department of the Research and Educational Hospitals of the University in Chicago, a position which she claims to have occupied prior to December 1, 1947, and from which she claims to have been unlawfully demoted. Trial by the court without a jury resulted in a judgment directing the issuance of a writ of mandamus as prayed, from which defendants have taken an appeal.

The case was tried for eight days, and because of the length of the record we set forth the essential facts, as to which there is substantially no dispute, as related in the briefs. The Board of Trustees of the University of Illinois is a public corporation created under the provisions of paragraph 22 [section 1] *et seq.*, chapter 144, Illinois Revised Statutes 1949 [Jones Ill. Stats. Ann. 138.022 (1) et seq.]. The University maintains its professional colleges of medicine, dentistry and pharmacy in Chicago where approximately 1,600 students are enrolled. In connection with these colleges, particularly the College of Medicine, the University maintains and operates the Research and Educational Hospitals (R & E Hospital). This is a general hospital of 348 beds and approximately 23 separate out-patient clinics, all operated as an adjunct of the professional colleges for the primary purpose of providing a laboratory in which teaching and research programs may be carried out.

Paragraph 38b, [section 36a] chapter 24½, Illinois Revised Statutes 1949 [Jones Ill. Stats. Ann. 23.038

(1)], provides in substance, with reference to the powers and duties of the Board of Trustees in relation to civil service matters, that the Board shall classify, by rules adopted for that purpose, all nonacademic positions and employments in the University, except those of the President, officers of the Board, administrative officers and professional and scientific positions. Such positions and employments constitute the classified civil service of the state in relation to the University, and all appointments are required to be made in accordance with the provisions of such rules. The statute also provides that no officer or employee in the classified civil service shall be demoted, removed or discharged unless for just cause, upon written charges, and after an opportunity to be heard in his own defense.

Among the civil service classifications for the R & E Hospital the Board established a position known as "Medical Social Worker." The duties and responsibilities of this position, as set forth in the job description approved by the Board, are as follows:

*"Definition:*
"Under supervision, to perform social service requiring a thorough knowledge of medical social work.

*"Duties by Example:*
"To interview cases; secure medical histories of patients; confer with social agencies and investigate and report the economic and domestic conditions of cases; undertake the treatment of social difficulties of patients; interpret to children, parents, and agencies the social implications of medical diagnosis and recommendations; arrange for care of patients, make necessary contracts with relatives; cooperate with relief and social welfare agencies in effecting medical treatment; make reports; keep records; perform duties as assigned.

76

*"Qualifications:*

"University graduation in medical social work and at least two years of experience in medical social work, one year of which must have been in a hospital clinic or public medical care program under the supervision of a qualified medical social worker; or: graduation from a two-year course in an approved school of social work in a recognized social service department of a hospital or clinic, one year of which must have been in a public medical care program under the supervision of a qualified medical social worker; good physical health; pleasing personality; supervisory ability; tact; good judgment; minimum age 25."

It appears from the evidence that effective September 1, 1941, plaintiff received a provisional appointment in the job classification, Medical Social Worker. Subsequently, she took a civil service examination for the position, and effective May 18, 1944, was certified thereto. Since September 1, 1941, she has been continuously employed by the University as a medical social worker, and that is the only civil service position in which she has ever been classified or employed. From time to time she has received substantial salary increases, her present annual compensation being $3,288.

From September 1, 1941, to December 1, 1945, plaintiff was the sole medical social worker employed at the hospital. In December 1945, a second person was employed in the same classification, and in the spring of 1946, a third was added. Thereafter, until December 1, 1947, the medical social work staff at the hospital consisted of three medical social workers, including plaintiff, and certain stenographic help.

Effective December 1, 1947, Marian Russell was duly appointed to the newly created position of "Director of Social Service" at the R & E Hospital, and has continued to occupy that position since that date.

77

Plaintiff claims that as a result of Miss Russell's appointment she has been unlawfully demoted and wrongfully deprived of the position and duties which she claims previously to have occupied and performed. There is abundant evidence to show that prior to Miss Russell's appointment as Director of Social Service, plaintiff and the other two medical social workers spent the major portion of their time in the performance of so-called medical social *case work*. Such case work consisted generally of working with individual patients of the hospital in an attempt to aid in the solution of financial, personal and social problems. Plaintiff testified that 50 per cent of her time was spent in the performance of such case work. The remainder of the time was spent in various other activities, many of which were clerical in nature, had no relation to medical social service work, and may be characterized generally as "admitting" or "intake" functions of the hospital. She spent one-half of one afternoon each week in the diabetic clinic scheduling doctors' appointments with patients, keeping clinical medical records and engaging in other activities of a clerical nature. She solicited donations to the hospital's blood bank, was responsible for the billing of social agencies in cases where such agencies paid for a patient's drugs and X rays, and conducted initial hospital interviews with war-veteran patients and patients known to social agencies. During this period the social service function at the hospital did not include the teaching of social service students or any formal program of instruction in social service work for medical or other students of the professional colleges of the University. The record clearly shows that plaintiff was not the head of a department functioning in an administrative or policy-making capacity. As a matter of fact, from an organizational standpoint, there was no social service department prior to the appointment of a Director of Social

Service in December 1947. Until that time the social service work was carried on as a part of the functions of the office of the Administrator of the hospital. From September 1941, to December 1945, plaintiff was the only social worker at the hospital, and obviously she could not have been regarded as the head of a department. After December 1945, two other social workers were employed, each of whom was classified as a medical social worker, as was plaintiff. Of course, since she had been at the hospital longer than the other two social workers, plaintiff assumed the exercise of some minor and incidental supervisory functions over them. However, the personnel records of the University definitely show that at no time was plaintiff formally designated as the head of the social service work or as having supervisory authority over the other two social workers; her duties and responsibilities were always those of a social worker at the case work or operating level.

In 1944 Dr. Raymond B. Allen, then Dean of the College of Medicine, and John Millizen, Administrator of the hospital, inaugurated a series of discussions for the future development of hospital social service work, to the end that the same would become a suitable laboratory in which to conduct a research and teaching program. Dean Allen secured an appropriation of $1,200 to cover the expense of a survey and analysis of the social service work at the hospital, and engaged the services of an independent expert, Mrs. Carol Cooley, Director of Social Service at the Presbyterian Hospital in Chicago, to make the survey. The work was undertaken by Mrs. Cooley in April or May 1946, and her report was submitted in December of that year. The executive committee of the hospital, which was a subcommittee of the executive faculty committee of the College of Medicine, was apprised of Mrs. Cooley's work and from time to time informed of the

progress being made. Mrs. Cooley's report contained an analysis of the nature and quality of the work performed at the hospital by plaintiff, as well as by the other two medical social workers, and set forth specific recommendations for the reorganization and expansion of such work and for academic and training standards for the director and other personnel of a social service department utilized for a teaching program in a university hospital.

In the fall of 1946, Dr. John B. Youmans was appointed to succeed Dean Allen. Following his appointment he discussed with Dean Allen the Cooley survey and Allen's plans concerning the social service program at the hospital. As explained to Youmans, Allen's plans contemplated the development of a social service department which would be satisfactory from the standpoint of operating practices and suitable for the teaching of social service courses to medical students, nurses, occupational-therapy students and students from the social service school located on the Urbana campus.

In September 1946, Dr. Andrew C. Ivy became Vice President of the University in charge of the Chicago professional colleges. One of his functions was to review all departments and services under his jurisdiction to determine and obviate their weaknesses. He decided that it was desirable to develop the social service work at the hospital into an *academic department,* and instructed Youmans to investigate the matter and take steps to develop the social service work on an academic scale so that the department might co-operate with the social service department or school at Urbana and with other institutions in Chicago, and so that the department could take on teaching functions and give internships in medical social work. He advised Youmans that he wanted the social service work developed into an academic department that would be accredited

and approved by institutions having similar departments and by the American Association of Schools of Social Workers which requires that the director and personnel on the teaching staff meet certain academic requirements.

It appears that the Division of Social Welfare Administration is a school of social service located on the Urbana campus which was started in the fall of 1944. The school offers both graduate and undergraduate courses in social service work and has about 200 undergraduate students, approximately 50 graduate students, and a faculty of ten full-time members, plus part-time lecturers. The graduate course of the school is a two-year curriculum leading to a master's degree. The school has been duly accredited by the American Association of Social Workers which is the recognized accrediting association in connection with the general programming of social service schools. However, since medical social work is a specialty within the general field of social work, such accrediting does not make it possible for the school to give degrees in medical social work which will be recognized unless the school is further accredited by the American Association of Medical Social Workers. Because of these circumstances Dr. Ivy specifically recommended to Dean Youmans that he contact Miss Marietta Stevenson, Director of the Division of Social Welfare Administration at the Urbana campus, so that plans could be made for the offering of courses in medical social service work to students from the Urbana campus in the Social Service Department at the R & E Hospital. It was contemplated by Dr. Ivy that such courses would be offered only if recognized accrediting standards were met so that graduates of the school would be accorded recognition. Thereafter, Miss Stevenson had several conferences with Dean Allen, and as early as December 1947, discussed with Dean Youmans the re-

organization of the social service work at the R & E Hospital so that it would include a teaching function in collaboration with the social service school at Urbana.

It further appears from the evidence that in addition to the Cooley survey the Chicago Council of Social Agencies, under the auspices of the United States Public Health Service, made a survey and analysis of medical social work being carried on at a number of institutions in the Chicago-Cook County area, including the social work at the R & E Hospital. A copy of this report was delivered to Millizen, Administrator of the hospital, on May 1, 1947, and a supplemental report was made in December of that year. These reports are referred to as the Cook County Health Survey, and like the Cooley survey contain an analysis of the nature and quality of the social service work conducted at the R & E Hospital, make specific recommendations for the reorganization and expansion of that work, and recommend standards of academic attainment and training for personnel employed in a social service department carrying on a teaching or academic program.

Dean Youmans testified that in carrying out the reorganization and expansion of the social service work at the hospital to include a teaching or academic program, he was influenced by the recommendations contained in the Cooley and Cook County Health surveys with which he had familiarized himself; and the reorganization of social service work at the R & E Hospital was described by Dr. Ivy in his testimony as *the development of "a service department" into "an academic department that will have university educational standing."* (Italics ours.) Among the aims and purposes to be attained in the program of reorganization, as described by Dean Youmans, was to have a social service organization which would provide proper social service work in connection with the hospital and the

care of patients, which would be adequate and proper for educational needs, particularly in connection with the training of social workers in collaboration with the department at Urbana, the training and teaching of medical students and nurses, the training and teaching of occupational therapists and those in allied fields, and such other personnel as would and should have training in social service. ''The plan for that was to select a head of the social service department that was qualified to organize, develop and supervise a proper social service department from the points of view which I have mentioned, that is, social service work teaching in all aspects which I have indicated, and I should add research.'' He also stated that the plan contemplated that the director of the reorganized department would participate in the teaching program and supervise both the teaching and the social case work functions of the department, and expressed his opinion as an expert in educational matters that the supervision of both these functions must be centered in the supervisor of the department and could not practicably be divided between two or more persons.

██ Although no formal plan or chart of reorganization was passed or submitted to the trustees in the form of a resolution, the record shows beyond doubt that plans for enlarging the scope of the social service function at the hospital had been discussed for several years by Deans Allen and Youmans, Dr. Ivy and many others, that the surveys heretofore mentioned and described by outside experts were given special consideration, that a special appropriation was obtained to defray the expenses of these surveys which were later discussed at numerous meetings of the executive committee, that Dean Youmans discussed the proposed reorganization with members of the executive committee, both in and outside of committee sessions, and thereafter on recommendation of Dean Youmans and

83

Dr. Ivy, the new position of Director of Social Service was duly created by the Board of Trustees, and Miss Russell was chosen from among several candidates, after investigation, to fill the position. This fact is reflected by the Board's approval on August 5, 1947, of the University's budget for the fiscal year 1947–1948, which clearly indicates the creation of the new position of Director of Social Service at an annual salary of $6,000 and differentiates between academic and nonacademic positions. The setup of the budget clearly indicates that Miss Kenny continued to be carried in a civil service position under a nonacademic classification and salary. We know of no law or regulation which requires the formal adoption of a plan of reorganization to effect the creation of a new position. The ultimate question is not whether a plan of reorganization was or was not formally adopted, but whether a new position was created having duties considerably different from those previously performed by plaintiff. Upon this question there is the uncontradicted testimony of Dean Youmans, Miss Stevenson, Dr. Ivy, Miss Russell and other witnesses that plans for enlarging the scope of the social service function at the hospital had been studied and discussed for a long period of time, as heretofore related, and finally implemented by the appointment of Miss Russell and the establishment of a definite program and curriculum. Part of the teaching program involved the giving of graduate courses to students from the social service school at Urbana, and it was definitely decided that commencing with the 1949 fall term, second-year graduate social service students from Urbana were to come to Chicago for at least one year of internship of social service work. The nature of the studies to be carried on by such students was described by Miss Stevenson in her testimony. She said that "the students would have field work supervision, that is, field instruction in

which they would actually be working in the agency carrying medical social work cases under field work supervision; they would also have courses in medical case work in order to have the theory go along with the practice; they would have courses in advanced medical information; they would probably have some additional courses on the medical setting; medical and health information about what goes on in the social service department; they would carry on research and medical social work." The curriculum described by Miss Stevenson contemplated the preparation of a thesis, and the entire course of study would lead to a master's degree in medical social work. In connection with this program it was planned that the Director of Social Service of the R & E Hospital would be a member of the faculty of the social service school at the Urbana campus, would conduct regular lecture and seminar courses, and would be fully responsible for the supervision of the teaching of the graduate students interning in medical social work at the R & E Hospital. Furthermore, beginning with the March 1949 academic quarter, the Director of Social Service was scheduled to conduct lecture courses pertaining to social service work for third and fourth-year students in the College of Medicine, and in this capacity would attain faculty rank.

Because of the academic and teaching functions of the Director of Social Service, the University, in selecting a person for such newly created position, by choice and necessity was bound by the standards promulgated by the American Association of Medical Social Workers. Dr. Ivy, Dean Youmans and Miss Stevenson were all agreed, as a matter of administrative determination, that the teaching and academic activities in the hospital's social service department should meet recognized accrediting standards. This involved adherence to the standards of the above-men-

85

tioned association, which was the recognized accrediting agency for schools giving degrees in medical social work. Furthermore, the standards of the association are recommended to all hospitals by the American College of Surgeons. These standards require that before a school may become accredited the Director of Social Service must have pursued a two-year postgraduate course leading to a master's degree in medical social work, and in addition have had an extended period of field work or training under qualified supervision. These considerations impelled the University to employ a person meeting the requirements set out by the accrediting agencies. Dean Youmans therefore contacted the American Association of Medical Social Workers, the Chicago Council of Social Agencies, the Director of Medical Social Service at Vanderbilt University, and other sources, to secure candidates for the position. Some seven or eight candidates, including plaintiff, were considered; Miss Russell, however, was selected, and her appointment as Director of Social Service at the R & E Hospital was confirmed by the Board of Trustees on January 8, 1948, and approved as an academic appointment for a period of nine months commencing December 1, 1947, and subsequently renewed by the Board on June 15, 1948, for a twelve-month period. It is undisputed that Miss Russell's academic training and experience were such that she met the academic standards. *It is equally clear that plaintiff does not possess the requisite qualifications for the position.* She lacks a master's degree, and therefore does not meet the standards of the American Association of Medical Social Workers, which must be satisfied if the teaching program is to be duly accredited, and also fails to meet the standards administratively adopted by Dean Youmans and Miss Stevenson as being necessary for one who is to supervise and participate in a teaching program and have

faculty status. In fact plaintiff admitted on the trial that she did not consider herself qualified to participate in a teaching program.

██ Plaintiff's argument that Miss Russell has not performed and is not at present performing actual teaching of graduate social service students from Urbana is beside the point. This suit was instituted before the teaching program could be inaugurated, and as counsel for defendants say, it was deemed inadvisable to begin the teaching of graduate students pending the final determination of this case, since the University is willing to proceed with the program only if it can be assured that the course will be fully accredited by the recognized accrediting agencies. Nevertheless, the record shows that certain definite and constructive steps have already been taken to implement the program. Before Miss Russell's appointment the social service staff at the R & E Hospital consisted of three case workers, including plaintiff. Miss Russell has increased this staff to a total of seven. The Illinois Eye and Ear Infirmary falls under the jurisdiction of the University, but being located several blocks distant from the R & E Hospital, its social workers were not subject to supervision by the social service staff at the hospital. In 1948 general supervision of the workers at the Infirmary was transferred and assigned to Miss Russell so that their work might be co-ordinated as part of the entire social service program. At the time of the transfer three social workers were employed at the Infirmary, and a vacancy existed which at the time of the trial Miss Russell was seeking to fill. Furthermore, arrangements have been completed for the transfer to Miss Russell of supervision and jurisdiction over one medical social worker and two psychiatric social workers employed at the Neuropsychiatric Institute who, prior to Miss Russell's appointment, were not supervised by the social service staff at the hospital.

As of the time of the trial the total staff to be supervised by Miss Russell consisted of thirteen to fourteen case workers. In addition Miss Russell has reorganized the work and functions performed by her department by establishing a system for keeping social service records, securing membership for her department in the Social Service Exchange, preparing and administering her own departmental budget, establishing a system for assigning case workers to specific clinics or services following the existing pattern of hospital administration, and eliminating from the work of the social service department many of the so-called "intake" or "admitting" functions formerly performed. As already stated, the teaching phase of her work could not be undertaken until the reorganization and expansion of her department was completed. Consequently, from the time of her appointment until the time of the trial in February 1949, much of her time was taken up with the reorganization and expansion of the social service department. She has spent considerable time in conferences with Dean Youmans, Miss Stevenson and others in formulating the anticipated teaching or academic program, and definite plans have been agreed upon involving the teaching by Miss Russell of social service courses to medical students at the appropriate time.

It is obvious that if the position of Director of Social Service is academic in nature it is not subject to civil service because the applicable statute (Ill. Rev. Stat. 1949, ch. 24½, par. 38b) [sec. 36a] [Jones Ill. Stats. Ann. 23.038 (1)] relates only to nonacademic positions. But the result in this case does not depend upon whether the position of Director of Social Service is subject to or exempt from civil service, but rather on the fact that Miss Russell's assignment is to a new position with duties and responsibilities substantially different from those formerly discharged by plaintiff,

88

who continues as a medical social worker to perform her duties as heretofore but under the supervision of the newly appointed Director of Social Service.

Plaintiff claims to have been *demoted* in violation of the civil service law. She asserts that Miss Russell is occupying the same position plaintiff formerly occupied, and that plaintiff's activities are now restricted to social service case work; and she seeks to be *restored* to the same position she claims to have previously occupied. She does not claim or seek to be promoted to a new or higher position. She apparently loses sight of the fact that Miss Russell's position was classified as academic by the Board of Trustees, and in the light of the duties and responsibilities assumed by Miss Russell, such classification was entirely proper. Consequently, if the position of Director of Social Service is a new position, created in good faith, as the record clearly indicates, with substantially different duties and academic in nature—and therefore not subject to civil service—plaintiff cannot prevail in this case.

The legal aspects of this suit present no serious difficulty. The trial proceeded on the false premise that plaintiff had "been illegally demoted and deprived of the performance of her duties as head of the Social Service Department at the Research and Educational Hospitals of the University of Illinois," and the court so found in the judgment order. The plain fact is that she was never head of a social service department; in fact there was no such department until after Miss Russell's appointment as director of that department. Miss Kenny was always classified as "a Medical Social Worker," and was never demoted from that position nor advanced to any other classification. The chancellor in summarizing his conclusions at the end of the trial expressed the opinion, contrary to the evidence as we read it, that prior to the appoint-

ment of Miss Russell as Director of the social service department, "plaintiff acted as the 'Head' or 'Supervisor' of the Social Service Department, with the complete knowledge and consent of the administrative agents of the defendants," and as a result of those findings concluded that "plaintiff is entitled to perform these duties [required of the Head or Supervisor of the social service department] until removed therefrom, as provided by law—that is, after a Civil Service hearing"; and cited *McArdle v. City of Chicago,* 172 Ill. App. 142, 216 Ill. App. 343, as conclusive. An examination of the *McArdle* cases discloses that the situation there presented was an obvious attempt by the city officials to be rid of a civil service employee in order that his position might be used for another. This is rendered clear by the opinion in 216 Ill. App. 343, at page 355. The case at bar does not present a situation involving the demotion or discharge of a civil service employee and his replacement in the same job with the same duties by another, all carried out in an attempt to evade the requirements of the Civil Service Act. The record cannot fairly be distorted to present another *McArdle* situation; it shows that the creation of the new position here was set up in the best of faith in the exercise of the discretion of the Board of Trustees, without any ulterior or political motive whatsoever, without intent to deprive plaintiff of any lawful rights, and that the duties of the new position are vastly different from those previously performed by plaintiff. The pertinent inquiry is whether some or any of the duties and responsibilities of a civil service position may be transferred and assigned as functions of a new position created in good faith without intent to evade or circumvent the civil service law. To hold that such a transfer cannot be effected would be tantamount to determining that civil service employees have a vested right to the continued performance of any duties and

responsibilities once assigned to them, and as counsel for defendants say, ''jobs and positions would be frozen at the levels at which they are established; reorganizations for the better administration of public bodies would be made impossible and efficiency and progress halted.'' The courts of this and other states have uniformly held that such transfers of functions and duties as were effected in this proceeding may be made, and that the same are not contrary to the letter or spirit of the civil service laws. *McNeil v. Mayor and City Council of Peabody,* 297 Mass. 499, 9 N. E. (2d) 566, involved a reorganization of certain civil service positions of the City of Peabody, and in discussing the right of the city to so reorganize, the court pertinently observed that while ''the purpose of civil service legislation was to protect efficient public employees from partisan political control, . . . it was not designed to prevent a city from undertaking in good faith a reorganization of a municipal department in order to promote effectiveness and economy. [Citing various Massachusetts decisions.]'' See also to like effect *Fitzsimmons v. O'Neill,* 214 Ill. 494; *People v. McLaughlin,* 362 Ill. 274; *City of Chicago v. People ex rel. Byrne,* 114 Ill. App. 145; *People v. Finn,* 237 Ill. App. 363; *State ex rel. Dunbar v. City of Seattle,* 121 Wash. 247, 208 Pac. 1092. The question presented in these cases is not whether the judgment of the city authorities was sound and correct, but whether their motives in ordering the change was proper, and the decisions must be regarded as establishing the broad principle that public bodies subject to civil service law, in the exercise of their discretion, may effect reorganizations, create new jobs and reassign job duties for any proper purpose; and having done so, their action is not subject to review by the courts except to determine whether there was or was not good faith and a reasonable exercise of discretion. The trial court in

the case at bar evidently adopted the view that a civil service employee is entitled to continue the performance of duties once assigned "until removed therefrom, as provided by law—that is, after a Civil Service hearing." We think the foregoing decisions clearly point out the error of this view of the law.

■ In the light of these conclusions we do not think it necessary to discuss at length defendants' contention that the trial court's judgment amounts to an attempt to review and control the exercise of discretionary powers by the Board of Trustees. The doctrine is well established in this state, both by Appellate and Supreme Court decisions, that the writ of mandamus will not be issued to compel public officials to exercise their discretion or perform discretionary duties or acts in a particular manner. *People v. Barrett*, 382 Ill. 321, and numerous other cases cited in defendants' brief.

For the reasons indicated we are of opinion that the judgment of the Superior Court should be reversed, and it is so ordered.

*Judgment reversed.*

SCHWARTZ, P. J. and SCANLAN, J., concur.