Thomas Charles, et al., Plaintiffs-Appellees, v. Orlando W. Wilson, Superintendent of Police of the City of Chicago, Paul W. Goodrich, et al., Members of the Police Board of the City of Chicago, William E. Cahill, et al., Members of and Constituting the Civil Service Commission of the City of Chicago, Alvin L. Weber, Comptroller of the City of Chicago, and William G. Milota, Treasurer of the City of Chicago, Defendants-Appellants.

Gen. No. 49,187.

First District, First Division.

August 3, 1964.

Rehearing denied September 21, 1964.

John C. Melaniphy, Corporation Counsel, of Chicago (Sydney R. Drebin and Robert J. Collins, Assistant Corporation Counsel, of counsel), for appellants.

Michael F. Ryan and Richard F. McPartlin, of Chicago, for appellees.

MR. PRESIDING JUSTICE MURPHY delivered the opinion of the court.

This is a declaratory judgment action brought by a number of Chicago Police Captains. Acting on a motion for summary judgment, the trial court entered a declaratory judgment order that "General Orders" of the Superintendent of Police, in establishing the positions of "District Commander" and "District Watch Commander," and in prescribing duties for such positions, are illegal and void. Defendants appeal.

The record consists of the pleadings and exhibits, answers to interrogatories, and affidavits. The judgment order recited, inter alia, that the position designated "District Commander" is the same as Captain of Police, and is within the civil service system and not an "exempt" position; that "Watch Commander" is the same as Lieutenant; that the assignment of Lieutenants to act as "District Commanders" and

Captains as "Watch Commanders" constitutes a downgrading and demotion of the Captains, depriving them of rights and duties of Captain; that all parties concede and the court finds that Superintendent of Police Wilson "was not motivated by any ill will and his only purpose was to improve the operation of the Police Department, notwithstanding that his actions with reference thereto were in violation of the Civil Service law applicable."

It is defendants' theory that (1) the Civil Service Act specifically authorizes the creation of exempt positions above the grade of Police Captain, and (2) the assignment of duties to police personnel is a matter of discretion with the department head.

Early in 1960, a major reorganization of the police force was commenced, and Orlando W. Wilson was appointed Superintendent of Police. At a meeting on July 5, 1960, of the Police Board of the City of Chicago, a resolution was adopted, under which the Superintendent of Police was authorized to reorganize the department, as follows:

"Be It Resolved that the Board hereby confers authority upon the Superintendent to reorganize the department and its chain of command, to fix authority and responsibility of various positions and component units and prescribe their titles, and to create, alter, or abolish titles, positions or units as he sees fit, such authority to be exercised by the Superintendent through Department General Orders subject to the after-the-fact approval or disapproval of the Board at its next subsequent meeting.

"Nothing in the foregoing resolution is intended to confer authority upon the Superintendent to alter civil service titles, ranks or positions."

On or about September 8, 1960, the Budget Proposals of the Department of Police for the year 1961

were submitted to the Civil Service Commission for study. The proposals included the new position of "District Commander," listed as exempt from classified service, at a salary rate of $12,384. After consideration, the Commission concluded that the position was an exempt one and designated a Title Code number to describe it, and thus recommended no change in the Budget Proposals as originally submitted. The post or position of District Watch Commander was not included in any determinations and was not investigated or acted upon by the Commission, nor did the technical staff of the Commission investigate the duties. On December 8, 1960, in legislative session, the City Council approved the 1961 budget, which contained the position of District Commander as a grade above that of Captain.

On December 15, 1961, the Superintendent of Police issued General Order No. 61–88, which established the exempt position of District Commander. The duties and responsibilities of the District Commander were summarized in the General Order. On the same date, the Superintendent issued General Order No. 61–89, which recited the duties and responsibilities of Police Captains assigned to duty as District Watch Commanders. The Police Board of the City of Chicago consented to the Superintendent's action in establishing the position and duties of the District Commanders.

In December, 1961, Orlando W. Wilson, Superintendent of Police, made assignments of "District Commanders" and "Watch Commanders." Twenty-one persons were assigned as "District Commanders," five of the persons, so assigned, being civil service Lieutenants and the remainder being civil service Captains.

Plaintiffs contend that the position designated as "District Commander" is, in fact, the position of Captain of Police as it has existed for many years, and

17

it is not exempt from civil service status or regulation, since it is not above the rank of Captain. Plaintiffs also contend that the duties presently performed by affiants as "Watch Commanders" are substantially the same duties performed when they were Police Lieutenants, and this resulted, for all intents and purposes, as a demotion from the full enjoyment of their civil service position of Police Captain. They argue that the Superintendent, of Police is without legal authority to create the position of "District Commander" and to exempt it from civil service or to place others than civil service Captains therein; that General Orders Nos. 61–88 and 61–89, issued December 15, 1961, which purport to create the positions of "District Commander" and "District Watch Commander," and to define their duties and responsibilities, are illegal and void.

Plaintiffs submitted affidavits setting forth the duties of Captains before and after the issuance of the General Orders. Captain Maurice Higgins, for example, in an affidavit, stated that "as Captain of Police . . . he was in charge of a larger number of personnel than presently assigned to said District under the reorganization, after the merger and consolidation of parts of other districts, . . . ; that the duties of District Commander are the same duties performed by this affiant, and other Captains of Police . . . prior to said reorganization." He further stated that the duties presently performed by the affiants as "Watch Commanders" are substantially the same as they had performed as Police Lieutenants, and "Watch Commanders" are not receiving the higher duties and responsibilities they had expected when promoted from Lieutenant to Captain. He further stated as Lieutenant of Police he performed all of the duties now being performed by him as "Watch Commander," and that the three "Watch Commanders" assigned to his district are all performing the duties

18

formerly performed by them as Lieutenants of Police. He pointed out that there is no classification of "Watch Commander" and no civil service verification of the position. He considers it downgrading and a demotion to have to do what he had formerly done as a Lieutenant.

Superintendent of Police Orlando W. Wilson, in an affidavit in support of defendants' contentions that the acts of the Superintendent were within his discretionary powers, and that the position of "District Commander" differs in kind from the position of Police Captain, alleged substantially the following: (1) The prime and basic characteristic of the civil service rank of Captain of Police is the responsibility for the administration and control of a major unit of operation. The function of a district station is to house prisoners and to serve as administrative headquarters and base of operation for the patrol force. For many years, district locations were dictated by population increases and the absorption of suburban towns. As the result of the mobility of the patrolman and his ability to communicate, the district system was reorganized and consolidated in the interests of efficiency and economy and reduced from 38 to 21 districts. This centralization released an average of 18 men to patrol duty for each of the 17 stations abolished.

(2) Prior to 1960, there were approximately 58 Police Captains, and at the time of the trial, there were about 95, with an additional 21 contemplated. This will double the number of Captains employed in March, 1960, although the district stations are now 21.

(3) In the reorganization, the division of the tour of duty of the district patrol force into three 8-hour shifts or watches was retained. The average "watch" of each district in 1958 was composed of one Lieutenant, four Sergeants, and 50 patrolmen. The new "watch" carries an average of two Lieutenants, eight

Sergeants, and 84 patrolmen. The average population per district has increased from approximately 93,000 to 169,000.

(4) The head of a "watch" or a "Watch Commander" is a key figure in the training of the patrol force. This training, which is essential to an effective police organization, was inadequate, and in many instances nonexistent, prior to the reorganization. The watch of today is not the watch of the past; it is a major area of responsibility and is accordingly the command function of a Captain. The use of the term "District Watch Commander" in no way diminishes the honors or duties or responsibilities of the civil service rank of Captain. This is not a "new position" created without the sanction of the Civil Service Commission, but is rather the description of the duty assignment of Captains who are operating in the district level.

(5) Prior to the reorganization and at the time of the Summerdale scandal, the basic weakness of the Chicago Police Department was lack of supervision. There were too few Sergeants and Lieutenants to perform this fundamental and vital function. The Table of Organization of the Department did not provide sufficient senior officers of the rank of Captain or higher, so that at least one senior officer could be available and on duty on a round-the-clock basis.

The affidavit of the Superintendent further states the responsibilities of the head of a district, or District Commander, have also increased. This is due not only to the fact that a higher rank is needed to supervise and coordinate the operations of a Watch Commander Captain, but because more is required of the head of a district than ever in the past. Since a district represents a greater number of citizens and a larger unit of the Police Department, it is imperative that its progress in the prevention of crime be charted closely; that a continual evaluation of its ef-

20

ficiency be conducted; that the closest possible contact with upper levels of command be maintained; that it be an integral part of the community it reppresents and protects. The smaller district of the past met these demands in small measure, if at all. In the past, a district was more of a citadel than a cohesive portion of the police structure. The District Commander must attend and be an active part of weekly meetings at the area level and with the Superintendent's office; he is required to submit daily, weekly and monthly reports concerning the incidence of crime and traffic accidents; he is required to actively participate in the affairs of his area and to meet regularly with civic organizations; he is required to constantly compare and evaluate himself and his men with respect to the activities and accomplishments of other districts. These duties and responsibilities were neither spelled out to nor exacted of the commander of a district prior to 1961.

Plaintiffs contend that the courts of Illinois have constantly sustained the rights of civil service employees to perform the duties of the position for which they were examined, certified and appointed, and have constantly struck down efforts by department heads of City Councils to circumvent the provisions of the Civil Service Act by creating new titles for positions which remain essentially the same.

Cases cited include People v. Kipley, 171 Ill 44, 49 NE 229 (1898); People ex rel. Byrnes v. Stanard, 9 Ill2d 372, 137 NE2d 829 (1956); City of Chicago v. Luthardt, 191 Ill 516, 61 NE 410 (1901); People v. Coffin, 282 Ill 599, 119 NE 54 (1918); and McArdle v. City of Chicago, 172 Ill App 142 (1912).

We agree with the pronouncements made in these cases, but we are not persuaded that they are determinative here, where it is conceded by all concerned that the reason for creating the questioned positions

was a major reorganization intended to increase the efficiency and economy of the police department.

Defendants, to show that the Superintendent has statutory power to create the exempt position of District Commander, cite "Exemptions from classified service," (Ill Rev Stats c 24, § 10–1–17), which includes "police officers above the grade of captain." Also, section 9–15.2, p 954, of the Revised Cities and Villages Act, 1941 (c 24), which provides that the Superintendent of Police "shall be responsible for the general management and control of the police department and shall have full and complete authority to administer the department in a manner consistent with the ordinances of the city, the laws of the state, and the rules and regulations of the police board."

Defendants argue that the enlarged districts and increased personnel made it "incumbent upon the Superintendent to establish a new position and to select from the Captains' ranks those whose qualities of leadership best suited them to command the newly established districts." They further argue that "it is their present duties about which plaintiffs complain," and that their "honors, emoluments, rights, status and prerogatives" have not been disturbed, and there is nothing in the record "proving that the duties assigned the plaintiffs are contrary to law."

We believe civil service legislation is not designed to prevent a Superintendent of Police from undertaking, in good faith and without intent to evade or circumvent the civil service laws, a reorganization of the Police Department and a revision of the "district system . . . in the interests of efficiency and economy," which has resulted in increasing "the responsibilities of the head of a district" in representing "a greater number of citizens" and "a larger unit of the [Police] Department." "Jobs and posi-

tions would be frozen at the levels at which they are established; reorganizations for the better administration of public bodies would be made impossible and efficiency and progress halted." (People ex rel. Kenny v. Fornof, 343 Ill App 73, 91, 98 NE2d 127 (1951).) In People v. Kipley, 171 Ill 44, 49 NE 229, the court said (p 59):

> "Where civil service laws have been adopted, they have been so adopted for the purpose of doing away with the evils which necessarily result from 'the spoils system.' Those evils have been fitly characterized as inefficiency, extravagance, the interruption of public business by place hunters, corruption of the electoral franchise, and political assessments."

We conclude that the provisions of section 10–1–17 of the Illinois Municipal Code are sufficient authorization for the creation of the new "exempt position" of District Commander as is established by General Order No. 61–88. As argued by the City, "the doubling in number of police captains, combined with the halving in number of police stations, necessitated a new position, with greater responsibilities."

As to the position of District Watch Commander, defendants contend, "absent improper motives," the discretionary act of a department head in assigning duties to personnel under his command is not subject to judicial review. They further argue that General Order No. 61–89 merely established the duties of police personnel—"Captains must perform some duties and the Superintendent has assigned some as Watch Commanders and others to other equally important duties within the Department. The Superintendent of Police must have discretionary power to assign members of the Department to duties he believes they are best qualified for." Authorities cited include 62 CJS Municipal Corporations § 575–a, p 1109 (1949):

"Assignment of duties. In general, police department authorities have discretionary power to assign its officers to the respective duties which they are to perform; . . . a patrolman, as a part of the police system, may be detailed to perform any duty connected therewith. Under provisions to that effect the chief of police has the duty of assigning the members of the police department to the performance of any duties within the police department."

Authorities cited include Kinney v. Nares, 125 Misc Rep 435, 211 NYS 714 (1925); Yarn v. City of Atlanta, 203 Ga 543, 47 SE2d 556 (1948); and Riley v. Mayor of New York, 96 NY 331 (1884). Also cited by defendants is Feeley v. O'Connor, 17 Ill App2d 123, 149 NE2d 411 (1958), where it is said (p 137):

"In addition to the ruling in our state (People ex rel. Kenny v. Fornof, 343 Ill App 73), there are numerous cases throughout other jurisdictions to the effect that the purpose of civil service legislation was to protect efficient public employees from partisan control, and it was not designed to prevent reorganization of a department to promote effectiveness and economy, and that civil service employees have no vested right to the performance of any duties or responsibilities once assigned to them."

Plaintiffs, in support of their contention that "a civil service employee is entitled to perform the duties for which he was examined and certified as well as to his proper title and pay status," cite People v. Errant, 229 Ill 56, 82 NE 271 (1907); People ex rel. Turner v. Johnson, 340 Ill App 171, 91 NE2d 119 (1950), and others.

24

In People ex rel. Gillespie v. Bundesen, 277 Ill App 169 (1934), in holding for plaintiff, the court said (p 178):

> "The office included not only the title, salary and room but all the duties, responsibilities, prerogatives and authority prescribed by the statute for such office, and which were as much a part of the office as were the title and salary, and could no more be taken from him than could these."

The court further found that, although an administrative body must operate with some degree of discretionary power, in this case they were not making an honest effort to carry out the law in its true spirit. In People ex rel. Turner v. Johnson, 340 Ill App 171, 91 NE2d 119 the court held, in substance, that plaintiff had a right not only to title and pay, but also to the duties of his civil service title and position.

The affidavits of plaintiffs in the record demonstrate beyond question that plaintiffs are important, dedicated career Police Captains, with a keen appreciation of their responsibilities to the department and the public. No exhaustive review is needed to demonstrate that the morale of a police department is of high importance, and any assignment of duties to a Captain of Police, which he believes to be a denial of the proper duties of a Captain and "an illegal downgrading" in his rank, is a matter of serious concern to the community and to the courts, and we so consider the instant situation.

However, the Superintendent of Police has the responsibility to the community of securing maximum efficiency from the police force at all rank levels, and his actions should not be subject to review by the courts, except to determine whether there was or was

25

not good faith and a reasonable exercise of discretion. The appointment of Lieutenants as District Commanders might be a ground on which to raise the question of good faith or a reasonable exercise of discretion. In the instant case, there were five Lieutenants who were appointed to the exempt position of District Commanders. However, this is a moot question now, as these Lieutenants were promoted to Captains while the proceedings were at the trial level, and in its argument the City refers to the selection of District Commanders "from the Captains' ranks those whose qualities of leadership best suited them to command the newly established districts."

It is admitted there are not sufficient districts now existing to provide all Captains of Police with the command responsibilities of a police district now being exercised by the present District Commanders. The affidavit of Superintendent Wilson also states: "The Summerdale Scandal could not have occurred with the supervision and control which is now exercised and which is now the responsibility of a senior officer as the Watch Commander of a district." We conclude the use of a Captain for a command position formerly held by a Lieutenant, even though the duties may be substantially the same, absent improper motives, is a discretionary matter of great importance. Duty assignment in a police department is a difficult area in which to justify court interference, and we do not believe the assignment of Captains as Watch Commanders, as here presented, is a matter for court action.

As none of the rights of the plaintiffs under their civil service status has been changed or affected by General Orders Nos. 61–88 and 61–89, and by the reorganization of the police department, we hold these two General Orders are clearly within the statutory

26

administrative power of the Superintendent of Police. Feeley v. O'Connor, 17 Ill App2d 123, 149 NE2d 411.

For the reasons given, the declaratory judgment entered in these proceedings is reversed.

Reversed.

BURMAN and KLUCZYNSKI, JJ., concur.